UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────x
E.C. and M.W., individually and on behalf of :
J.C., a child with a disability, :
:
                    Plaintiffs, :
: **OPINION AND ORDER**
        - against - :
: 11 Civ. 9429 (ER)
BOARD OF EDUCATION OF THE CITY :
SCHOOL DISTRICT OF NEW ROCHELLE, :
:
                    Defendant. :
────────────────────────────────x

Plaintiffs E.C. and M.W. (the "Parents"), on behalf of their minor child, J.C. ("J.C.," and collectively with the Parents, the "Plaintiffs"), bring an action against the Board of Education of the City School District of New Rochelle ("Defendant" or the "District") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2), and New York Education Law § 4404.3, challenging the District's placement of their son and seeking reimbursement for his private school tuition at Manhattan Children's Center ("MCC"). Plaintiffs brought this appeal from a decision of the State Review Officer, who found in favor of the District. The parties have filed cross-motions for summary judgment. Docs. 10, 15. For the reasons set forth below, Plaintiffs' motion for summary judgment is DENIED and the Defendant's motion for summary judgment is GRANTED.

## I.  Statutory Framework

Congress enacted the IDEA to encourage the education of children with disabilities. *E.A.M. ex rel. E.M. v. N.Y.C. Dep't of Educ.*, 11 Civ. 3730 (LAP), 2012 WL 4571794, at *1 (S.D.N.Y. Sept. 29, 2012) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982)). Under the statute, any state receiving federal funds must provide a free appropriate public education

("FAPE") to disabled children.  20 U.S.C. § 1412(a)(1)(A); *Rowley*, 458 U.S. at 179.  To satisfy

its obligation, the FAPE provided by the state must include "special education and related

services" tailored to meet the unique needs of the particular child, 20 U.S.C. § 1401(9), and be

"reasonably calculated to enable the child to receive educational benefits."  *Rowley*, 458 U.S. at

207.

A public school ensures that a student with disabilities receives a FAPE by providing the

student with an Individualized Education Plan ("IEP").  *Polera v. Bd. of Educ. of Newburgh*

*Enlarged City Sch. Dist.*, 288 F.3d 478, 482 (2d Cir. 2002).  An IEP is a written statement,

collaboratively developed by the parents, educators, and specialists, that "sets out the child's

present educational performance, establishes annual and short-term objectives for improvements

in that performance, and describes the specially designed instruction and services that will enable

the child to meet those objectives."  *Honing v. Doe*, 484 U.S. 305, 311 (1988), *superseded by*

*statute*, *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036 (9th Cir. 2009).

Because New York State receives federal funds under the IDEA, it must comply with the

requirements of the statute.  *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 123 (2d

Cir. 1998).  In New York, the task of developing an IEP rests with local Committees on Special

Education ("CSEs"), whose members are appointed by the board of education or trustees of the

school district.  N.Y. Educ. Law § 4402(1)(b)(1); *Heldman on Behalf of T.H. v. Sobol*, 962 F.2d

148, 152 (2d Cir. 1992).  In developing a child's IEP, the CSE must consider four factors:  "(1)

academic achievement and learning characteristics, (2) social development, (3) physical

development, and (4) managerial or behavioral needs."  *E.A.M. ex rel. E.M.,* 2012 WL 4571794,

at *1 (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107-08 (2d Cir. 2007))

(internal quotation marks omitted).  The IEP must "be reasonably calculated to enable the child

to receive educational benefits," *Gagliardo*, 489 F.3d at 107 (citation and internal quotation marks omitted), "likely to produce progress, not regression," and afford the student with an opportunity greater than mere "trivial advancement."  *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak,* 142 F.3d at 130) (internal quotation marks omitted).  However, a school district is not required to provide "every special service necessary to maximize each handicapped child's potential," *Cerra,* 427 F.3d at 195 (citation and internal quotation marks omitted), or "everything that might be thought desirable by loving parents." *Walczak,* 142 F.3d at 132 (citation and internal quotation marks omitted).  Furthermore, under an IEP, "education [must] be provided in the 'least restrictive setting consistent with a child's needs'" and the CSE must "be mindful of the IDEA's strong preference for 'mainstreaming,' or educating children with disabilities 'to the maximum extent appropriate' alongside their non-disabled peers."  *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012) (citations omitted).

"Parents may challenge the adequacy of their child's IEP in an 'impartial due process hearing' before an [Impartial Hearing Officer ("IHO")] appointed by the local board of education." *E.A.M. ex rel. E.M.,* 2012 WL 4571794, at *2 (quoting *Gagliardo*, 489 F.3d at 109). The IHO's decision may be appealed to a State Review Officer ("SRO"), and the SRO's decision can be challenged in either state or federal court.  *Id.* (citation omitted).  When reviewing the SRO's decision, a district court may "receive the records of the administrative proceedings."  20 U.S.C. § 1415(i)(2)(C).  The district court shall then "grant such relief as the court determines is appropriate," based on the preponderance of the evidence.  *Id.*  Under the statute, "appropriate" relief may include reimbursement for the cost of a private school placement.  *E.A.M. ex rel. E.M.,* 2012 WL 4571794, at *2.

3

## II. Factual Background[1]

Plaintiff J.C., currently eight years old, has been diagnosed with autism and suffers from severe developmental delays, which often manifest in toileting difficulties and biting of himself and others.  The District has classified J.C. as a student eligible for special education and related services as a student with autism; his classification is not currently in dispute.  Pls.' Resp. 56.1 ¶ 4.  In this action, the Parents challenge the 2010-11 IEP, however, the Court will briefly discuss earlier events as they provide context to the development of the contested IEP.

### A. Dr. Salsberg's 2009 Psychological Summary

On February 7 and April 25, 2009, when J.C. was attending a non-District preschool program, Dr. David H. Salsberg, a clinical neurologist ("Dr. Salsberg"), was hired by the Parents to perform a psychological evaluation of J.C.  SD Ex. 44.  Dr. Salsberg concluded that J.C. exhibited behaviors consistent with Autism Spectrum Disorder.  Accordingly, he recommended the following:  (1) behavioral intervention using Applied Behavioral Analysis (discussed below); (2) a kindergarten class of eight students, one teacher, and two assistants ("8:1+2 ratio") that "*includes* [one-to-one] (1:1) instruction based on a 12-month curriculum;" (3) continuation of home-based services, as well as speech-language therapy and occupational therapy ("OT); and

---

[1] The Court has reviewed the administrative record provided by the parties.  The following facts are drawn from the parties' Local Rule 56.1 Statements, transcripts of the testimony heard by the IHO, exhibits introduced at the IHO hearing, and the decisions of the IHO and SRO.

References prefixed "Tr. _" refer to the transcript of the impartial hearing conducted from March 21-24, 2011.  "SD Ex. _" refers to exhibits submitted by the District for the impartial hearing and "P Ex. _" refers to the Parents' exhibits for the hearing.  References to the "IHO Dec. at _" are to the May 31, 2011 Impartial Hearing Decision and references to "SRO Dec. at _" are to the State Review Officer's Decision dated September 6, 2011.  References to "Pls.' 56.1 Resp. ¶_" refers to Plaintiffs' Response to Defendant's Local Rule 56.1 Statement of Undisputed Material Facts and "Def.'s Resp. 56.1 ¶_" refers to Defendant's Response to Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts.

(3) J.C.'s classroom should "*include* other children who are interactive and can model and promote good social behavior." *Id.* at 5-6 (emphasis added).

## B.  2009-10 School Year

During the 2009-10 school year, J.C. attended kindergarten at the District's Barnard Elementary Childhood Education Magnet School ("Barnard"), and was placed in an 8:1+2 special education class taught by Dr. Susan Silvestri ("Dr. Silvestri").  SD Ex. 15 at 1.[2]  J.C.'s 2009-10 IEP also provided for related services of speech-language therapy, OT, PROMPT training,[3] parent counseling and training and home-based services.  SD Ex. 38 at 1-2.

Additionally, as specifically requested by the Parents, the District agreed to provide the Student with a 1:1 "Transition Support Services" aide to help him successfully transition to a school program from a primarily home-based instructional program.  *See id.* at 2, 6; Tr. 45.  As requested by the Parents, the Student's 1:1 aide was an individual from the Center for Autism and Related Disorders ("CARD").  Tr. 45.

As part of the regular review of J.C.'s progress during the 2009-10 school year, the District convened a CSE on March 18, 2010.  SD Ex. 26 at 1; Tr. 43-45.  According to the meeting report, the Parents felt that their son's program was "fine;" however, they expressed concerns regarding J.C.'s developmental delays as he experienced communication difficulties and he was engaging in biting.  SD Ex. 26 at 6.  As a result of "continued concerns with regards

---

[2] Dr. Silvestri is a board certified special education teacher and a Board Certified Behavioral Analyst-Doctoral ("BCBA-D") with a Ph.D. in behavior analysis.  SD Exs. 16 at 2; 20 at 12-13.

[3] PROMPT is an acronym for "Prompts for Restructuring Oral Muscular Phonetic Targets" and is defined as a "tactile-based therapy technique used for reshaping individual and connected sounds and sound sequences."  P Ex. J at 2.

to safety and biting," the CSE "recommended that the current transitional aide be continued

through 5/31/2010 and data reviewed at the next[]sub-CSE meeting."  *Id.*

### C.  CSE Meeting of June 17, 2010

On June 17, 2010, the District held a CSE meeting to develop the Student's 2010-11 IEP.

SD Exs. 13 at 6; 18 at 1-3.[4]  The meeting was chaired by Yvette Goorevitch, Director of Special

Education for the District ("Goorevitch"), who was familiar with J.C. as she had observed the

Student's classroom on three or four occasions during the 2009-10 year.  Tr. 33-34, 40-41; IHO

Dec. at 2.[5]  In addition to Goorevitch, the CSE included Dr. Silvestri; Debbie Whitman,

Barnard's Behavior Intervention Specialist ("Whitman");[6] Roseanne Ferber-Lerner, Barnard's

Speech Language Pathologist ("Ferber-Lerner"); the Student's Parents; and a general education

teacher.  SD Ex. 18 at 1; Tr. 48-49, 57.

### a.  Dr. Silvestri's Educational Evaluation and Progress Summary

Dr. Silvestri, J.C.'s special education teacher, provided the CSE subcommittee with an

Educational Evaluation and Progress Summary dated June 13, 2010.  SD Ex. 20.  In her report,

Dr. Silvestri described J.C.'s class as being designed and organized according Applied

Behavioral Analysis ("ABA"), which is not a specific teaching methodology, but rather consists

of a set of educational principles "in which tactics derived from principles of behavior are

applied systematically to improve behavior and data [is] collected in order to identify the

---

[4] The June CSE meeting lasted approximately two hours.  Tr. 86.

[5] Goorevitch has been involved in special education for approximately thirty-five years, has been employed as the District director for twenty years, has a master's degree in special education focused on the education of children with behavioral disorders and autism, and has completed a doctoral course in special education and curriculum development.  *See* IHO Dec. at 2; SRO Dec. at 2 n.2.

[6] Whitman "observed [J.C.] as part of his evaluation when he first came into the [D]istrict and then got to know him through the CSE process when he came into [Barnard].  She taught the child in an 8:1+2 class in 2009-2010."  IHO Dec. at 2.

variables responsible for behavior change." *Id.* at 1.  Various teaching tactics have been utilized

as part of ABA, including Discrete Trial Teaching ("DTT"), Natural Environment Teaching,

Picture Exchange Communication System and Verbal Behavior Analysis.  According to Dr.

Silvestri, "none of these [teaching tactics] are ABA itself, as ABA is a science, not a method."

*Id.* at 1-2.  Accordingly, an ABA classroom uses principles of behavior to produce a productive

learning environment and "[s]tudent instruction is measured and student responses to instruction

are analyzed in light of known relationships between behavior and environment."  *Id.* at 2.

Dr. Silvestri's report also included the results of J.C.'s evaluation on the Assessment of

Basic Language and Learning Skills-Revised ("ABBLS-R") and provided the ABBLS-R data

she had collected.  SD Ex. 20 at 1-15; Pls.' Resp. 56.1 ¶ 21; Tr. 58.  The ABLLS-R is a criterion-

referenced assessment that provides "specific information on functional language and learning

skills" for children with autism and associated developmental delays.  SD Ex. 20 at 2; Tr. 59.

Using the ABBLS-R data, Dr. Silvestri provided a summary of J.C.'s progress.  She

reported that he had made progress in the areas of receptive language (following instructions);

expressive language (requesting and labeling); following routines; visual and auditory

discrimination (matching and finding stimuli and participating in group activities by responding

vocally or selecting a response from an array of options); play (using blocks, puzzles, and toys

appropriately); and social skills (eye contact, greetings, and reducing biting behavior).  Pls.'

Resp. 56.1 ¶ 22.[7]  Dr. Silvestri also reported that J.C. had made progress in adhering to

classroom routines and in generalizing those routines outside of the classroom.  SD Exs. 18 at 1-

---

[7] In their 56.1 Response Statement, the Plaintiffs wrote, "Plaintiffs admit that Dr. Silvestri provided such summary and report."  Pls.' Resp. 56.1 ¶ 22.  Plaintiffs make similar statements throughout their submission.  These responses do not serve as proper denials and the Court will deem such statements as admissions.  *See also* Pls.' Resp. 56.1 ¶¶ 24, 31-32, 40.

2; 20 at 4.  However, she reported that J.C. had not mastered his toilet training goals and his articulation hampered his progress in many areas because of difficulties in making himself understood.  Pls.' Resp. 56.1 ¶ 24.  Additionally, Dr. Silvestri noted that biting remained a significant impediment to his progress.  SD Exs. 18 at 2; 20 at 7-8.  Finally, Dr. Silvestri's report detailed J.C.'s progress toward his eighteen IEP annual goals and his short-term objectives, and the specific conditions used to evaluate J.C.'s progress.  SD Ex. 20 at 5-11.

> b.  <u>Behavior Intervention Plan</u>

The CSE reviewed J.C.'s Behavior Intervention Plan ("BIP"), dated November 1, 2009, which was developed by Whitman, the District's Behavior Intervention Specialist.  SD Exs. 13 at 6; 37 at 4.  The purpose of the BIP was to target J.C.'s biting tendencies and the BIP listed prevention strategies and ways to decrease biting.  SD Ex. 37 at 2-3.

> c.  <u>Independence Skills Plan</u>

The CSE also reviewed the Student's Independence Skills Plan ("ISP") dated June 8, 2010.  SD Ex. 23; Pls.' Resp. 56.1 ¶ 27.  Goorevitch testified that the District develops such a plan for every student who has been assigned a 1:1 aide.  The ISP focused on developing the Student's independent skills on short-term objectives.  Each day, District staff would record data on the Student's progress on various short-term objectives and the data would be summarized each week.  Tr. 79-80.  According to Goorevitch, in her experience students became "overly dependent" on a 1:1 aide when only provided with opportunities for 1:1 instruction throughout the day, and therefore the District developed an ISP as soon as a 1:1 aide was recommended for a student.  *Id.* at 93-94.  J.C.'s ISP identified fifteen specific activities that required direct intervention by his 1:1 aide.  The activities selected for the ISP included waiting, transitioning, packing or unpacking his backpack, having lunch, and toileting.  SD Ex. 23.

8

      d.  <u>After-School Home Program</u>

The CSE reviewed J.C.'s Home Program Annual Progress Note dated June 14, 2010, which was prepared by Whitman, who coordinated J.C.'s after-school home program.  SD Ex. 22; Pls.' Resp. 56.1 ¶¶ 31-32.  J.C.'s home program consisted of ten hours a week of 1:1 DTT programming to supplement and support J.C.'s school program.  SD Ex. 22 at 1; Tr. 213. Whitman reported that J.C. could identify the letters A, J, and D; identify his name from a field of four names; match a variety of pictures or objects; follow simple one-step directions; and follow directions presented in DTT format.  SD Ex. 22 at 1-2.  Whitman also reported that J.C. had decreased his biting behavior since April 2010.  *Id.* at 3.  However, J.C. still had issues with toileting and his toileting home program needed to be modified.  SD Exs. 18 at 2-3; 22 at 2.

      e.  <u>Speech-Language Progress</u>

Ferber-Lerner, Barnard's Speech Language Pathologist, provided a summary of the Student's speech progress.  SD Ex. 18 at 3.  Ferber-Lerner reported that J.C.'s expression of targeted nouns and verbs had significantly improved, that the Student had expanded his noun length of utterance from one to two words, and that the clarity of his expression had improved. SD Ex. 18 at 3; Tr. 52-53.

      f.  <u>CSE Recommendations</u>

Upon review of the information presented at the June 2010 CSE meeting, the CSE decided to extend J.C.'s school year through the summer and continue the services in his 2009-10 IEP.  SD Ex. 18 at 1; Tr. 53-54.  However, the CSE decided that J.C.'s 1:1 aide would no longer be a CARD employee but would be replaced by a District employee with "extensive experience in working with children in ABA programs."  Tr. 54.  The Student's new 1:1 aide, Lisa Greco ("Greco"), was assigned to begin working with him during the 2009-10 extended

9

summer program.  Pls.' Resp. 56.1 ¶ 36; Tr. 279.  Greco had a high school diploma and

additional credits.  Tr. 115.  She had been working at the District since 1997 and had been

trained in ABA.  *Id.* at 279.  Additionally, according to Goorevitch, Greco "ha[d] taken in-

service training provided by [Whitman] for several years, focusing on principles of consistency,

behavioral intervention, planning, implementation of programs, consistent data collection, and

ha[d] worked in classrooms taught by ABA-trained staff [for] all of her career with [the

District]."  *Id.* at 115.

At the conclusion of the meeting, the CSE did not issue an IEP for the 2010-11 school

year because the Parents informed the District that they had privately obtained an updated

psychological evaluation of their son by Dr. Salsberg.  Accordingly, the CSE agreed to

reconvene and evaluate J.C.'s program for the 2010-11 year after receiving a copy of the

evaluation report.  *Id.* at 53.

**D.  Dr. Salsberg's Updated Psychological Report**

The District received Dr. Salsberg's updated psychological report, dated June 12 and

June 15, 2010, in early August 2010.  *Id.* at 55; SD Ex. 21 at 1.  The report was based on Dr.

Salsberg's review of documents from Barnard, discussions with the Parents and a one-hour

observation of J.C. in Barnard's library, in the 8:1+2 classroom during group time and during the

provision of ABA programing.  SD Ex. 21 at 2; Tr. 366, 368, 406.  Dr. Salsberg did not conduct

formal testing because he believed it would not be "valid or informative" due to J.C.'s

"significant difficulties with language, as well as with attention and overall self-regulation."  SD

Ex 21 at 2.

During his observation of J.C., Dr. Salsberg noted that Greco, the Student's 1:1 aide was

present, but her work mostly involved redirecting J.C.'s behavior and monitoring his activity

level and impulsivity and "keep[ing] [J.C.] from running around the classroom."  SD Ex. 21 at 2; Tr. 372.  After his evaluation, Dr. Salsberg concluded that placement in an 8:1+2 classroom did not allow for appropriate progress, as any 1:1 intervention focused on containing J.C.'s maladaptive behaviors.  SD Ex. 21 at 2-3.  Rather, the Student required a "1:1, full-time ABA program which is data driven and delivered by an ABA educator throughout the day."  *Id.* at 3.  Furthermore, he noted that "[i]t is imperative that [J.C.] be placed in a full-time 1:1 ABA learning environment, as part of a specialized, ABA school with related services, family training and education and 12-month services."  *Id.*  He also recommended an after-school program to promote generalization and prevent regression, and stated that J.C.'s "myriad of needs and lack of progress speak to the immediate need of a more intensive and specialized program."  *Id.* at 2-3.

Dr. Salsberg later testified that his recommendation of a 1:1 full-time ABA program is a program where each child has their own 1:1 ABA consultant, "not a paraprofessional or someone who's just following a routine . . . ."  Tr. 373.

### E.  CSE Meeting of August 13, 2010 & Final IEP

After receiving Dr. Salsberg's updated psychological evaluation, the CSE subcommittee reconvened for approximately two hours on August 13, 2010 to complete J.C.'s IEP for the 2010-11 school year.  SD Ex. 13 at 1-2; Tr. 86.  At the time of the meeting, J.C. exhibited significant delays across all areas of development and demonstrated delayed cognitive skills, significant weaknesses in receptive and expressive language, adaptive behavior, limited social skills and deficits in fine motor skills and sensory processing.  Pls.' Resp. 56.1 ¶¶ 63-64.  J.C. also engaged in task-avoidance and self-stimulatory behaviors that interfered with learning.  *Id.* at ¶ 65.

The CSE reviewed the following: (1) Dr. Salsberg's updated psychological report, SD Ex. 21; (2) Dr. Silvestri's June 2010 Educational Evaluation, SD Ex. 20; (3) a summer 2010 progress report prepared by Dr. Silvestri, SD Ex. 16; (4) a PROMPT Speech Therapy report, SD Ex. 27; and (5) OT updates, SD Ex. 24. Pls.' Resp. 56.1 ¶¶ 38-39. The CSE also reviewed the Student's goals for 2010-11. SD Ex. 13 at 6.

      a. <u>Dr. Silvestri's Summer Progress Report</u>

J.C. was enrolled in Dr. Silvestri's 8:1+2 class for the summer of 2010. Def.'s Resp. 56.1 ¶ 9. In her updated report, Dr. Silvestri explained that by the end of the summer program, J.C.: (1) averaged less than one toileting accident per day and had six consecutive days without an accident on a fifteen minute toilet training schedule; (2) he had improved his transition skills and could now walk with an adult between locations in the school without having his hand held; (3) he was able to walk back to the classroom from the bathroom with an adult nearby; (4) he could walk throughout the school with praise and reminders to stay with the teacher approximately every five feet; (5) he had maintained his academic discrimination skills (matching letters of the alphabet, identifying pictures of faculty members, finding his name in array with other students' names); (6) he was counting with 1:1 correspondence; (7) he was following directions; and (8) he was making eye contact and had increased interactions with his teachers, often initiating requests and greetings. Pls.' Resp. 56.1 ¶ 40; SD Ex. 16 at 1. As relates to J.C.'s biting tendencies, Dr. Silvestri's report indicated that J.C. "continue[d] to work on replacing biting with other functionally equivalent behavior" and biting was "at its highest this summer" when he was experiencing loose bowel movements. SD Ex. 16 at 1-2.[8]

---

[8] Later, during the impartial hearing, Whitman echoed Dr. Silvestri's conclusions regarding J.C.'s progress and testified that by the end of the 2009-10 school year, J.C. could walk independently in the hall without holding

With respect to the new 1:1 aide, Dr. Silvestri testified that during the summer, J.C. had "made a very good transition" and that J.C. "responded very well to her."  Tr. 84.  Dr. Silvestri also reported that the aide had been able to "run [J.C.'s] instructional programs successfully over the summer."  *Id.*

### b.  Parents' Concerns About The Proposed 6:1+2 Special Class

During the meeting, the Parents expressed concern that their son was making "slow progress."  SD Ex. 13 at 6.  In response, the CSE discussed the need to expose the Student to activities within small groups and across settings including the playground, auditorium, library and the gym.  The Parents questioned how their son could actually benefit from these proposed activities.  *Id.*  The Parents also expressed concern about J.C.'s rate of progress during the 2009-10 year in the 8:1+2 special class.  Pls.' Resp. 56.1 ¶ 67.

During the meeting, the District proposed a 6:1+2 special classroom for J.C.  The Parents objected since J.C.'s mother had previously visited a 6:1+2 class at Barnard during the spring of 2010, to determine whether a smaller class might be appropriate for J.C., and found the class to be unacceptable.  IHO Dec. at 2-3; Def.'s Resp. 56.1 ¶ 5; Tr. 63.  The Parents later explained that the proposed class would not offer J.C. a "suitable and functional peer group" and the staff could not properly manage the needs of the children in the class.  SD Ex. 12 at 2.

The District responded that the 6:1+2 class for the 2010-11 school year was significantly modified from the one observed by J.C.'s mother.  First, the District advised the Parents that a new special education teacher, Erin McDermott ("McDermott"), had been hired for J.C.'s

---

someone's hand if someone walked behind or slightly away from him.  J.C. could also sit for short periods of time at a table to have a snack while a person was nearby.  Tr. 182.

recommended class.  Pls.' Resp. 56.1 ¶ 48.  McDermott had an undergraduate degree, a master's degree in education and certifications in childhood elementary education and childhood elementary education for students with disabilities.  Tr. 263-64.  She also had experience working in an ABA school and had received training in verbal behavior ABA and toilet training. *Id.* at 264-70.  In addition, the District implemented substantial curriculum and program development, provided extensive development to the classroom staff, and substantially invested in assistive technology.  SRO Dec. at 22; Tr. 89-90.

F.  Consideration of Other Options

In preparation for J.C.'s 2010-11 IEP, the CSE considered several placement options, including remaining in the 8:1+2 special class and Dr. Salsberg's recommendation for a program of strictly 1:1 instruction.  SD Ex. 13 at 7.  The final IEP noted that the current 8:1+2 class was rejected because J.C.'s "current language processing, motor needs, social/emotional development, and academic skills indicate that a more intensive setting with support is needed to address the [S]tudent's needs."  *Id.*; *see also* Tr. 73-74.  Goorevitch later "characterized the recommended . . . special class as 'more intensive' because it contained fewer students and more opportunities for higher levels of adult intervention and programming, as well as more opportunities for each student to respond."  SRO Dec. at 22.  Whitman also echoed this view and testified that she thought of J.C.'s proposed 6:1+2 program as more "intense," but would not classify it as a more "restrictive" program.  Tr. 206-07.

The CSE rejected the program of solely 1:1 instruction "because while 1:1 instruction is available and provided throughout the day," the Student "require[d] continued exposure to peers in a classroom setting to develop joint attention and play skills, ability to follow routines within a

14

group and to develop leisure time skills such as being exposed to activities such as gym, library and other co-curricula[r] age appropriate activities."  SD Ex. 13 at 7.

    G.  Recommendations

    After reviewing the evidence presented at the August 13 meeting, the CSE recommended placing J.C. in a District 6:1+2 special class with the services of Greco, the full-time 1:1 aide. J.C. would also receive a home-based program consisting of 10 hours per week of 1:1 ABA services.  SD Ex. 13 at 1, 6-7.  The CSE also recommended the following related services:  (1) one 60-minute session per month of indirect behavior intervention consultation; (2) two 30-minute sessions per week of individual OT; (3) one 30-minute session per week of OT consultation; (4) four 60-minute sessions per month of indirect parent counseling and training; (5) two 30-minute sessions per week of individual (PROMPT) speech-language therapy; and (6) two 30-minute sessions per week of individual speech-language therapy.  *Id.* at 1-2.

    J.C.'s IEP included fifty-seven annual goals to address J.C.'s identified needs in the areas of waiting, attending, following routines and directions, transitioning, oral motor function, receptive and expressive language, greetings, requesting, play, sensory integration, social interaction, imitation, fine motor skills, and activities of daily living.  Pls.' Resp. 56.1 ¶ 49.  The goals section of the IEP explained the evaluation criteria for mastery of a goal, the procedures to evaluate a goal, the evaluation schedule and assigned responsibility for evaluation to a specific District staff member.  SD Ex. 13 at 7-16.  J.C.'s IEP did not include short-term objectives.  Pls.' Resp. 56.1 ¶ 51.

    Finally, the Student's 2010-11 IEP also provided for special transportation; program modifications, accommodations, supplementary aids and services; assistive technology devices; support for school personnel, including a BIP; and testing accommodations.  SD Ex. 13 at 1-16.

### H.  Events After August CSE Meeting

By letter dated August 24, 2010, the Parents notified the District of their rejection of the 2010-11 IEP and of their intent to unilaterally place the Student at MCC for the 2010-11 school year and to seek tuition reimbursement from the District.  SD Ex. 12 at 1-2; Pls.' Resp. 56.1 ¶ 8. The Parents asserted that the August CSE continued to recommend a classroom setting for their son despite his "documented difficulties functioning in his current 8:1+2 classroom with a 1:1 aide."  SD Ex. 12 at 1.  The Parents noted that "as discussed" at the August CSE meeting, J.C. required "1:1 ABA instruction all day."  *Id.* at 2.  In their letter, the Parents also confirmed that they planned to meet with McDermott before the start of the school year.  *Id.* at 2.

J.C.'s mother met with McDermott before the start of the school year and inquired about the teacher's experience and qualifications.  Tr. 274-75, 463-65.  J.C.'s mother also asked McDermott if J.C. could be excused from participating in extracurricular activities so that he could "just do ABA in the classroom."  *Id.* at 275-76.  According to J.C.'s mother, at the meeting with McDermott, she learned that her son would not be provided with 1:1 DTT instruction.  *Id.* at 466.

The parties then reconvened at a CSE meeting on September 8, 2010 to address the Parents' concerns regarding the final IEP.  SD Ex. 7 at 6.  The Parents explained that J.C. continued to bite at home and they had not seen a decrease in his biting behavior.  However, the CSE continued to believe that the District had created an appropriate program to meet J.C.'s needs and did not modify the Student's program.  *Id.* at 6-7.

### I.  Due Process Complaint

On November 17, 2010, the Parents filed a due process complaint notice alleging that the District had failed to offer J.C. a FAPE for the 2010-11 school year, noting procedural flaws in

the development of the IEP and the substantive inadequacy of the recommended program.

Specifically, the due process complaint notice alleged that:

- the annual goals and short-term objectives in the final IEP were generic, vague and not measurable, and in the alternative, the IEP failed to include short-term objectives and failed to include SMART goals;

- J.C. required 1:1 DTT instruction throughout the "entire" academic day;

- the proposed 6:1+2 class failed to offer J.C. a functional peer group for instructional, social and emotional purposes;

- the proposed program could not address J.C.'s cognitive, academic, behavioral, sensory and language needs;

- the recommended 6:1+2 special class used an inappropriate "eclectic" methodology when J.C. required a "consistent 1:1 ABA approach;"

- MCC was an appropriate placement and addressed J.C.'s academic and social and emotional needs, and equitable considerations did not preclude an award of tuition reimbursement; and

- the Parents also reserved the right to raise any other issues that could arise during the pendency of the litigation, including: (1) challenging the qualifications of the District's proposed aide or classroom teacher, and (2) challenging the appropriateness of the recommended program as it would not maintain an appropriate student-to-staff ratio for the entirety of the school day.

SD Ex. 3 at 1-4.

### J.  The IHO Hearing

The IHO conducted a four-day hearing between March 21 and March 25, 2011.  Pls.' Resp. 56.1 ¶ 12.  As relevant to this appeal, and not already discussed above, testimony at the impartial hearing provided additional information on:  (1) ABA and DTT instruction and the role of 1:1 aide; (2) the student makeup of the 6:1+2 special class; and (3) the appropriateness of J.C.'s goals and his skills regression.

a.  <u>ABA & DTT Instruction & Role of the 1:1 Aide</u>

During the impartial hearing, Goorevitch testified that J.C. would receive a structured ABA program in a 1:1 format for the majority of the day in the proposed 6:1+2 special class.  Tr. 69-70.  The proposed class is data driven and delivered by an ABA instructor throughout the day. *Id.* at 70-71.  Goorevitch also explained that through the 1:1 aide, J.C. "has access to and is provided with continual one-to-one instruction, redirection, reinforcement, opportunities for learning, but it is given within a classroom that contains five other children."  *Id.* at 70.  She also noted that "[t]he way the classroom works is all of the teaching staff rotate through the DTT programs with the children, as well as in J[.C.]'s case[,] programs were run expressly by his one-to-one aide." *Id.* at 108.

McDermott, who had reviewed various documents and recordings about J.C., but had never met him, testified that the proposed 6:1+2 class was a full-time all-day ABA program where ABA methodology was used even when DTT instruction was not being provided.  *Id.* at 304.  She also testified that DTT is a core part of the curriculum, and during DTT instruction, teachers, assistant teachers and aides use the student's program book which includes the student's program developed according to his or her ABBLS assessment, IEP goals, behavior plan and toileting schedule.  *Id.* at 303-06.  Furthermore, during DTT, there may be two students with one teacher; while the teacher is working with one student, the other student is engaged in another activity such as handwriting, matching or looking at a story.  *Id.* at 298.  DTT is also performed in a dyad if the goal is to teach turn-taking.  *Id.* at 298-99.  McDermott also explained that a child in one of her classes would receive about one to two hours of 1:1 DTT per day.  *Id.* at 324, 331.

18

McDermott also testified that the 1:1 aide would help J.C. with transitioning and behavior problems but would not have provided instruction. *Id.* at 344. The 1:1 aide would have accompanied J.C. to all specials; "she is there with [J.C.] sitting beside him the whole day." *Id.*

Whitman then provided additional context on DTT. Whitman testified that DTT typically occurs in a 1:1 setting but can also be done in a dyad and in a class. *Id.* at 165-68. During DTT, Whitman explained that the instruction "is broken down into small increments with clear antecedents, clear behaviors and consequences" for the student. *Id.* at 166. Whitman explained than an individual discrete trial consists of "one unit of learning between a teacher and a student," and, a student's program may involve "10 to 20 individual trials of learning one program," which are specifically designed for a student, and data is taken following presentation of the trials. *Id.* at 165-66. Whitman also provided additional testimony regarding the role of the 1:1 aide when she explained that 1:1 support and supplemental intervention would be provided throughout the school day by the trained 1:1 aide under the supervision of the special education teacher. *See generally* Tr. 167-69.

### b.   Student Composition of the 6:1+2 Special Class

Goorevitch testified that in the 6:1+2 class for the 2010-11 school year, J.C. would have been grouped with students ages six to eight years old who presented classifications of multiple disabilities, autism, mental retardation and emotional disturbance. SD Ex. 55 at 1-3; *see* Tr. 278-91. McDermott testified that like J.C., the students in her class had cognitive levels below the 1% level and six of the children received similar related services, including speech therapy, physical therapy, OT and PROMPT therapy. SD Ex. 55 at 1-3; Tr. 287-89. McDermott also "described the various activities and programs in her class and was of the opinion that the child

would have been a good fit for her class and would have benefited from her class." IHO Dec. at 5.

        c.   Dr. Salsberg's Clarifications

Goorevitch testified that J.C.'s proposed class would "provide[] him with opportunities for engagement with his peers . . . [s]o he has opportunities within that setting for co-curricular and incidental opportunities to be with typically developing, same aged peers." Tr. 71-72. However, during the impartial hearing, Dr. Salsberg clarified his 2009 evaluation recommendation that J.C.'s classroom "include other children who are interactive and can model and promote good social behavior." SD Ex. 44 at 5-6. Dr. Salsberg testified that placement with other children did not mean placement with mainstream students but rather placement with autistic students in a special education class "who could be worked with in a dyad" or provide social or communication models. Tr. 384-85; Pls.' Resp. 56.1 ¶ 102. In fact, Dr. Salsberg did not believe that a child with the profile and behavior of J.C. would actually benefit from being exposed to typically developing peers. IHO Dec. at 7.

Dr. Salsberg also clarified that the 1:1 instruction that he believes J.C. requires is instruction from an educator and not from an aide who delivers services without having the educational background to instruct; specifically, "someone with ABA background to be directly interacting with [J.C.] throughout the day." Tr. 364. J.C.'s mother echoed this view. *Id.* at 466-67. However, Dr. Salsberg acknowledged that he never spoke with McDermott or even visited the proposed 6:1+2 class; and further, at the time he produced the 2010 updated report, he was aware that the Parents were considering placing the Student at MCC. Pls.' Resp. 56.1 ¶ 43; Tr. 406.

Dr. Salsberg further testified that he no longer believed J.C. needed home-based services due to the intensity of the MCC program and that his recommendation in the June 2010 updated report for a minimum of 10-15 hours per week of home-based ABA services to promote generalization, prevent regression and to make appropriate progress was contingent upon J.C. attending a District program.  Pls.' Resp. 56.1 ¶ 103.

### d.   <u>Appropriateness of Goals & Characterization of J.C.'s Progress</u>

Tomiko Lyons, J.C.'s lead teacher at MCC testified that in her opinion, six of the fifty-seven goals in the 2010-11 IEP "were a couple of steps ahead of where [J.C.] actually [was at the time of the impartial hearing]."  *Id.* at ¶ 52.  Lyons also testified that the June 2010 Educational Evaluation Progress Summary, SD Ex. 20, was incorrect in several respects regarding the child's abilities.  IHO Dec. at 10.  She further testified that she did not believe that J.C.'s inability in September 2010 to demonstrate certain skills identified in the District's June 2010 report resulted from regression following nearly a month-long absence from school.  Tr. 628-32.  She believed that J.C. never had these skills as reported in the IEP.  IHO Dec. at 10-11.  However, Lyons testified that J.C.'s programs at MCC had partially been based upon the annual goals contained in the 2010-11 IEP.  *Id.* at 602.

Moreover, Dr. Amy Davis Lackey, the education coordinator at MCC ("Lackey"), testified that the 6:1+2 class was inappropriate for J.C. since he could not function in that setting and "need[ed] a skilled 1:1 instructor all day."  IHO Dec. at 9.  At MCC there are six kids in a class and all have 1:1 instructors.  *Id.*

### e.   <u>J.C.'s Skills Regression</u>

Testimony from Lyons and Lackey stated that as soon as a new skill was added to J.C.'s repertoire, he lost something previously learned.  *Id.*; Tr. 599.  Specifically, Lackey testified that

"[w]ithout proper generalization he will lose old skills for every new skill learned."  IHO Dec. at

8.  Furthermore, during the impartial hearing, the Parents acknowledged that their son exhibited

regression following school breaks or illnesses.  Pls.' Resp. 56.1 ¶ 59.  Following such absences,

J.C. needed to relearn or be reminded of, for example, how to sit at a table, and his tolerance for

instruction would go down.  *Id.* at ¶ 60.  Furthermore, J.C.'s skills could be brought back up, but

a longer break often corresponded to more regression.  *Id.* at ¶ 61.

### K.  The IHO's Decision

On May 31, 2011, the IHO issued a decision holding that the District had failed to

provide J.C. with a FAPE.  IHO Dec. at 18.  According to the IHO, the deprivation of a FAPE

arose from a combination of procedural and substantive violations.

First, the IHO found that the 6:1+2 program was essentially the same as the 2009-10

8:1+2 program, as it would still only have a high school graduate, "presumably trained in ABA,"

to accompany the Student all day.  *Id.* at 13.  The IHO noted that the District had failed to

explain the role of the 1:1 aide and how the aide would have provided instructional services—

specifically, how the aide would do more than provide physical restraint services or interact with

the teacher to implement DTT or other learning approaches under ABA.  The IHO also noted

that although the District testified that the 1:1 aide for the 2010-11 class had at least fifteen years

of experience in the District, he wondered "why she had not seen fit to obtain a college degree

and educational credentials during that lengthy period of time."  *Id.*  Finally, with respect to the

1:1 aide, the IHO held that since there was no direct testimony from a school aide or

paraprofessional responsible for administering ABA, "it is not possible to know definitely

whether the one-to-one personnel assigned to the child do anything more than physically restrain

the child during the course of the school day."  *Id.*  The IHO later reaffirmed that "[w]ith no

22

college or educational credentials, the aide had no ability to impart educational instruction through the use of ABA." *Id.* at 15.

Second, the IHO relied on Dr. Salsberg's testimony regarding the purpose and qualifications of the 1:1 aide. The IHO cited Dr. Salsberg's testimony that "one-to-one instruction must mean instruction from an educator [and] [i]t does not mean an aide who delivers services without having the educational background to instruct." *Id.* at 14. The IHO also cited Dr. Salsberg's observations of the 8:1+2 class, where he concluded that the 1:1 aide was not providing meaningful instruction and the 6:1+2 class would not have provided better services since J.C. needed "appropriate" 1:1 instruction throughout the day. *Id.*

Third, the IHO found Lyons to be "persuasive." *Id.* The IHO credited Lyons' view that the August IEP was "seriously wanting." *Id.* Specifically, Lyons believed that J.C.'s goals were "far advanced for him even after the start of the 2010-11 school year," and six of the fifty-seven goals were "inappropriate." *Id.* The IHO relied on Lyons' testimony that Dr. Silvestri's June 2010 Educational Evaluation and Progress Summary, SD Ex. 20, "was incorrect in many respects regarding the child's skills." *Id.* The IHO referred to the August IEP and Dr. Silvestri's progress summary as containing "serious misstatements." *Id.* at 15. Also, the IHO credited Lyons' testimony rejecting the District's contention that J.C.'s skills had significantly regressed during the weeks between the end of Barnard's summer program and the beginning of the school year at MCC. *Id.* at 14.

Fourth, the IHO found that Goorevitch's testimony that J.C. would receive a full day ABA program was contradicted by McDermott's testimony, who testified that DTT would be provided in her 6:1+2 class during the school day for only one to two hours. The IHO also contrasted McDermott's testimony that she performed her DTT in a dyad with that of Whitman

who testified that it was not typical to perform DTT in a dyad. *Id.* at 13.  The IHO concluded

that the District offered "conflicting testimony" whether J.C. did receive or should have received

DTT in a dyad and whether this occurred for one or two hours a day.  "How many actual minutes

of one-to-one educational instruction was spent exclusively between the ABA-trained teacher

and the child appears to be minimal according to the <u>uncontradicted</u> testimony of Dr. Salsberg."

*Id.* at 15 (emphasis in original).

Finally, the IHO held that the Parents met their burden of proving that MCC was an

appropriate placement for J.C. for the 2010-11 school year and that equitable considerations did

not preclude an award of full tuition reimbursement.  *Id.* at 15-18.

### L.  The SRO's Decision

The District appealed the IHO's decision to the SRO and on September 6, 2011, the SRO

issued his decision.  The SRO overruled the IHO decision in its entirety and held that the District

had in fact offered J.C. a FAPE for 2010-11.  SRO Dec. at 9.

First, the SRO found that the IHO failed to consider the evaluative data and information

reviewed by the CSE subcommittees when developing the Student's 2010-11 IEP.  *Id.* at 8-9.

The SRO found that the June and August CSE's considered the following evaluations and

reports:  (1) Dr. Silvestri's June 2010 evaluation report; (2) March 2010 Speech Language

annual report; (3) June 2010 ISP; (4) June 2010 home program annual progress note; (5) data

related to the Student's toilet training program; (6) Student's BIP and data related to biting; (7)

August 2010 progress report; and (8) Dr. Salsberg's 2010 report.  SRO Dec. at 9 (citing Tr. 46-

53; SD Exs. 13, 15-16, 18, 20-24, 27, 33-37).[9]  Accordingly, the SRO concluded that a review of

---

[9] The SRO's decision indicates that the CSE reviewed a March 2010 OT annual review report.  However, the Court
cannot locate this document upon review of the record.  SRO Dec. at 9.

the evidence, and "in particular, the evaluative information and data unaddressed by the [IHO]," "demonstrates that the CSE subcommittees carefully and accurately included information in the August 2010-11 IEP to describe the student's present levels . . . of academic achievement, social development, physical development, and management needs." *Id.* at 17.

Second, the SRO found that the IHO erred in concluding that the goals were not appropriate to meet J.C's needs, gave undue weight to Lyons' testimony, and ignored evidence that supported finding the annual goals to be appropriate. *Id.* at 17-18.  The SRO found that even accepting Lyons' opinion that six of the fifty-seven goals were inappropriate, "such harm— within the context of a total of 57 annual goals in this case—would constitute no more than a de minim[i]s harm and is not, alone, . . . a sufficient basis to find that the [D]istrict denied the [S]tudent a FAPE." *Id.* at 18.  Moreover, contrary to the testimony of Lyons, the annual goals "adequately target[ed] the student's identified needs, clearly define[d] the criteria for mastery, and describe[d] how the [S]tudent's progress [would] be measured consistent with the regulations." *Id.*

Third, the SRO noted that the August IEP did not contain short-term objectives corresponding to the annual goals, which is inconsistent with State regulations. *Id.*  However, the SRO found that the evidence of short-term objectives was included in the following evidentiary sources:  (1) Dr. Silverstri's June 2010 report, "which summarizes and reports upon the [S]tudent's progress on 18 of the annual goals contained in the 2009-10 IEP, and which includes definitions of the short-term objectives and specific conditions used to evaluate the [S]tudent's responses for his annual goals;" (2) J.C.'s 2009-10 ISP which includes short-term objectives for each skill in which J.C. was working toward independence; and (3) testimonial evidence that the District's ABA classrooms recorded data throughout the school day and

25

analyzed the data on a weekly basis.  *Id.*  Therefore, the SRO concluded that although the 2010-11 IEP did not contain short-term objectives corresponding to the annual goals, the IEP was not deficient because "there is evidence upon which it can be reasonably inferred that . . . the [D]istrict would implement the 2010-11 IEP and assess benchmarks of the [S]tudent's progress toward his annual goals in a manner similar to its assessment of the [S]tudent's progress toward his annual goals during the 2009-10 school year."  *Id.* at 18-19.  Accordingly, this failure did not result in denial of a FAPE.  *Id.* at 19.  However, the SRO cautioned the District that in the future, short term benchmarks should be included in the Student's IEP.  *Id.*

Fourth, the SRO found no reason to "speculate" that the 1:1 aide would not have been able to competently provide services to J.C., especially in light of the evidence that the aide had already been successfully providing services to him.  *Id.* at 20.  The record showed that she had worked throughout her career at the District in ABA classrooms and had been trained by Whitman, the District's behavior consultant.  *Id.*  The hearing record also indicated that J.C. "made a very good transition" to the aide and that he "responded very well to her," and that she had been able to "run [J.C.'s] instructional programs successfully over the summer."  *Id.*  Further, the SRO found that there was no allegation that the aide lacked the requisite credentials to perform her duties.  *Id.*

Fifth, the SRO found that contrary to Lyons' testimony that she did not believe that J.C. exhibited regression in his skills from the prior year when he entered MCC, testimony by Whitman and even by Lyons and Lackey demonstrated that as soon as J.C. learned a new skill, he would forget a skill previously learned.  *Id.* at 24.

Sixth, the SRO also found that the "weight of the evidence" did not support Dr. Salsberg's contention that J.C. could not receive any educational benefit from exposure to

typically developing peers.  The SRO found Dr. Salsberg's testimony "equivocal" with respect to this issue.  *Id.* at 24-25.

Finally, after review of the information considered by the different CSE subcommittees, the SRO found that the proposed 6:1+2 class offered J.C. a FAPE in the least restrictive environment, *id.* at 20-22, for the following reasons:

- the Parents expressed their concerns about J.C.'s rate of progress during the 2009-10 school year in the 8:1+2 class during the development of the 2010-11 IEP and the District considered several placement options in response, including remaining in the 8:1+2 class and Dr. Salsberg's recommendation of a program of strictly 1:1 instruction;

- the 6:1+2 class observed by the Parents during 2009-10 had substantially changed because of a new teacher, substantial curriculum and program development, staff development, increased use of assistive technology and different students in the class;

- the students in the 6:1+2 class had abilities commensurate to those of J.C.;

- Whitman testified that she agreed with the recommended class because although J.C. had made progress in the 8:1+2 class, she thought that the more "intensive" 6:1+2 class, with a smaller student-to-staff ratio and the expertise of the newly hired special education teacher, may have accelerated J.C.'s progress.  The smaller classroom, coupled with the 10 hours of 1:1 ABA home instruction, would have given J.C. the best opportunity to learn during 2010-11;

- according to the hearing record, and verbal and written reports considered at the CSE meetings, J.C. demonstrated "slow but steady progress" throughout the 2009-10 school year and summer term in his ability to attend to instruction, identify his own name, make requests, wait, follow one-step directions, follow and generalize classroom routines, request preferred items, match pictures, imitate vocal and gross motor models, play with toys and interact socially; he also demonstrated success in toilet training and exhibited decreased biting; and

- evidence showed that the 6:1+2 class applied ABA throughout the day as well as daily 1:1 DTT, and the classroom staff had been trained to provide DTT and record data throughout the day.  Also, evidence showed that District's ABA classrooms used a variety of evidence-based teaching tactics from ABA, including, but not limited to, DTT.  Moreover, according to Whitman, an ABA classroom does not mean a 1:1 DTT program all day and a class may still follow

ABA principles when students are engaged in group activities, rather than in 1:1 DTT.

*Id.* at 21-25.

Having found that the District offered J.C. a FAPE for the 2009-10 school year, the SRO declined to evaluate whether MCC was an appropriate private school placement.  *Id*. at 26.  Thus, the SRO annulled the IHO's determination that the District was required to reimburse the Parents for J.C.'s MCC tuition.  *Id*. at 27.

On December 22, 2011, the Plaintiffs commenced the present action to appeal the SRO's decision.  Doc. 1.  On May 9 and May 10, 2012, the parties made the present motions for summary judgment.  Docs. 10, 15.  The Plaintiffs assert that the SRO's decision below was both procedurally and substantively improper.  The Defendant contends that the SRO's decision was correct and should be affirmed.

### III. Discussion

#### A.  Standard of Review

Upon an aggrieved party's appeal of the SRO's decision to the federal district court, the court must review the entirety of the administrative record in addition to supplemental evidence upon either party's request.  20 U.S.C. § 1415(i)(2)(c).  Though IDEA appeals tend to come before the district court as motions for summary judgment, *see e.g. Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006), the existence of a genuine issue of material fact does not necessarily result in denial of the motion.  *J.R. v. Bd. of Educ. of the City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004).  Rather, a motion for summary judgment in the IDEA context is more akin to an appeal from an administrative determination. *M.H.*, 685 F.3d at

226 (citing *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).

A district court reviewing a claim for private school tuition reimbursement under the IDEA must carry out either a two or three-step process.  First, the court must ask "whether the state has complied with the procedures set forth in the IDEA."  *Cerra,* 427 F.3d at 192.  Second, the court must determine "whether the IEP developed through the Act's procedures '[is] reasonably calculated to enable the child to receive educational benefits,'" *Id.* (alteration in original) (quoting *Walczak,* 142 F.3d at 129).  If these requirements are met, then the state has complied with its obligations under the IDEA.  *Id.*  However, if these requirements are not met, the court then asks "whether the private schooling obtained by the parents is appropriate to the child's needs." *Id.*

The rulings of the IHO and the SRO are subject to "independent" judicial review, however, a federal court's role in reviewing state educational decisions under the IDEA is "circumscribed," as the judiciary "generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Gagliardo*, 489 F.3d at 112 (citation and internal quotation marks omitted).  Upon independently reviewing the administrative record, the court must make a determination based upon a preponderance of the evidence, which "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.  Rather, the federal courts must accord "substantial deference" to such findings. *Cerra*, 427 F.3d at 191.  Furthermore, district courts should abstain from making "subjective credibility assessments."  *M.H.*, 685 F.3d at 240 (quoting *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 383 (2d Cir. 2003)) (internal quotation marks omitted).

29

As the Second Circuit has recently articulated, the district court's analysis of the administrative findings below must "hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether it was based on substantial greater familiarity with the evidence and the witnesses than the reviewing court." *M.H.*, 685 F.3d at 244.  That being said, the court's conception of whether the administrative findings are persuasive "must also be colored by an acute awareness of institutional competence and role . . . [and] courts are required to remain conscious of these considerations in determining the weight due any particular administrative finding."  *Id.*  District courts should afford more deference to administrative findings as to the substantive adequacy of an IEP, *id.* (citing *Cerra*, 427 F.3d at 195), and to any findings "grounded in thorough and logical reasoning,"  *id.*, than to determinations addressing whether an IEP was developed according to the proper methods.  *Id.* District courts are also advised to show greater deference when "its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency."  *Id.*

Finally, "[i]f the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight."  *E.A.M. ex rel. E.M.,* 2012 WL 4571794, at *5 (citations and internal quotation marks omitted).  Therefore, courts "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer."  *Id.* (citation and internal quotation marks omitted); *see also Matrejek v. Brewster Cent. Sch. Dist.*, 471 F. Supp. 2d 415, 426 (S.D.N.Y. 2007), *aff'd*, 293 F. App'x 20 (2d Cir. 2008) (deferring to the SRO's determination because doing otherwise would invite the court to substitute its "own uninformed judgment for the opinions of persons with far greater expertise without having any basis to do so . . . .").  However, when the district court correctly finds that the SRO's

determinations are "insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO," the court may "consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than [] rely[ing] exclusively on its own less informed judgment. *M.H.*, 685 F.3d at 246.

### B.   The SRO's Decision Merits Deference

The Plaintiffs argue that the SRO's decision merits no deference from this Court.  They note that "[t]he instant case does not require a review of any questions of educational policy," but rather "the issue before th[e] Court is whether the SRO improperly departed from the IHO's findings of fact absent any independent basis, reweighed the credibility determinations and the weight to be given to the testimony of witnesses observed by the IHO, and failed to explain his reasons for doing so, in contradiction to basic principles of judicial truth-finding."  Pls.' Mem. L. 4; *see also* Pls.' Opp. Mem. L. 6.  Moreover, Plaintiffs argue that the SRO improperly disregarded the IHO's credibility determinations and failed to conduct a full review of the evidence.  Pls.' Mem. L. 2.

As an initial matter, the central issue before the Court is whether the District's recommended placement for the 2010-11 school year was adequate to meet J.C.'s educational needs—i.e., the substantive adequacy of the 2010-11 IEP.  Whether the IEP was substantively adequate is undoubtedly a question of educational policy in which this Court must defer to the expertise of the SRO.  *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) (citing *M.H.*, 685 F.3d at 244); *see also J.P. ex rel. D.P. v. N.Y.C. Dep't of Educ.*, 10 Civ. 3078 (ERK) (MDG), 2012 WL 359977, at *9, 13 (E.D.N.Y. Feb. 2, 2012).  Moreover, deference to the SRO is particularly appropriate where, as here, the SRO conducted a thorough review of the entire

record before the IHO and has clearly explained the basis for his conclusions.  *Walczak,* 142 F.3d at 129; *W.S. ex rel. C.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 137 (S.D.N.Y. 2006).

Turning to Plaintiffs' contention that the SRO improperly ignored the IHO's findings of fact and credibility determinations, the Court finds that there is no basis for this contention.  In support of their claim, Plaintiffs argue that the SRO necessarily rejected the IHO's credibility determinations because the SRO "inject[ed] his own opinion of the credibility of witnesses he never saw or heard testify."  Pls.' Reply Mem. L. 2; Pls.' Mem. L. 10.  As examples, Plaintiffs point to the SRO's determination that Dr. Salsberg's testimony that J.C. did not gain meaningful benefit from exposure to typically developing peers was "equivocal," Pls.' Reply Mem. L. 4, and the SRO's rejection of Lyons' testimony that the goals in J.C.'s IEP were inadequate, which had been credited by the IHO.  Pls.' Opp. Mem. L. 6.  However, these findings do not implicate the credibility of those witnesses.  Rather, it reflects the commonplace situation where the IHO and SRO reviewed the same testimony and drew differing conclusions.  This "does not mean that the SRO improperly ignored the IHO's determinations, or that the SRO's review was not thorough and careful."  *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 11 Civ. 00157 (LTS), 2011 WL 5130101, at *8 (S.D.N.Y. Oct. 28, 2011) (citing *R.R. v. Scarsdale Union Free Sch. Dist.,* 366 F. App'x 239, 242 (2d Cir. 2010) (rejecting the argument that the SRO ignored the IHO's findings where, as here, the record did not reveal any instance where the SRO did so, nor did appellants point to one)); *S.F. v. N.Y.C. Dep't of Educ.*, 11 Civ. 870 (DLC), 2011 WL 5419847, at *15 (S.D.N.Y. Nov. 9, 2011) (finding that there was no credibility dispute when the SRO did not make a judgment as to the veracity of the parents' purported beliefs about what was right for their child because "[t]he conflict here is not which side is truthful.  Rather, it is a disagreement about educational policy and the legal obligations of the [District] under the IDEA, an area in

which the SRO is accorded deference.").  Accordingly, the Court will give appropriate deference

to the SRO's careful and thorough decision.[10]

## C.  Procedural Adequacy[11]

A procedural violation renders an IEP legally inadequate only when the violation (1)

"impeded the child's right to a [FAPE], (2) "significantly impeded the parents' opportunity to

participate in the decisionmaking process regarding the provision of a [FAPE]," or (3) "caused a

deprivation of educational benefits."  *E.A.M. ex rel. E.M.,* 2012 WL 4571794, at *6 (quoting 20

U.S.C. § 1415(f)(3)(E)(ii)); *see also Werner v. Clarkstown Cent. Sch. Dist.*, 363 F. Supp. 2d 656,

659 (S.D.N.Y. 2005) (finding that procedural violations "do not automatically require a finding

of a denial of a FAPE.").  However, "procedural inadequacies that individually or cumulatively

result in the loss of educational opportunity or seriously infringe on a parent's participation in the

creation or formulation of the IEP constitute a denial of a FAPE."  *Werner*, 363 F. Supp. 2d at

659.

The Parents here assert two procedural violations in J.C.'s 2010-11 IEP; that (1) the

SRO's *sua sponte* determination that the District's failure to include short-term objectives in the

2010-11 IEP did not deprive J.C. of a FAPE was incorrect, and (2) the IEP did not include a

description of how the annual goals would be measured.  Pls.' Mem. L. 7.  The IDEA requires

---

[10] Plaintiffs claim that the SRO's reversal of the IHO's decision was "improperly premised on a finding that the [P]arents' verbal and written notice to the District was substantially deficient contrary to the express language of the notice provision."  Pls.' Mem. L. 6.  The District, however, asserts that the SRO's reversal was based upon the full hearing record and not on inadequate notice by the Parents of their unilateral placement of J.C. at MCC.  Def.'s Opp. Mem. L. 6-7.  The Court's review of the SRO's decision supports the District's argument.

[11] The District asserts that the Plaintiffs failed to allege any procedural errors in their Due Process Complaint.  Def.'s Mem. L. 9 n.3.  However, this is incorrect as the Due Process complaint specifically alleges that the goals in the IEP were generic, vague and not measurable, and in the alternative, that the IEP failed to include short-term objectives and SMART goals.  SD Ex. 3 at 1-4.

that the IEP include short-term, as well as long-term, academic and nonacademic goals for each

student, as well as evaluative procedures for measuring a student's progress in achieving these

goals. *M.H.*, 685 F.3d at 245 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(III); 34 C.F.R. §

300.320(a)(2)-(3); NYCRR tit. 8, § 200.4(d)(2)(ii)).  "[W]hether a procedural or a substantive

issue-the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which

the IDEA requires deference to the expertise of the administrative officers."  *Grim,* 346 F.3d at

382.

Plaintiffs point out that the IEP failed to include short-term objectives but do not

demonstrate how this procedural error denied J.C. of a FAPE.  Nevertheless, the Court will still

address the merits of Plaintiffs' procedural claim.  The SRO concluded that the 2010-11 IEP did

not contain short-term objectives corresponding to the annual goals.  SRO Dec. at 18.  However,

the SRO found that the failure to include short-term objectives in the 2010-11 IEP did not rise to

the level of denial of a FAPE after review of the following evidence:

- Dr. Silvestri's June 2010 report, which summarized and reported on J.C.'s progress on eighteen of the annual goals in the 2009-10 IEP and included definitions of the short-term objectives used to evaluate J.C.'s progress toward his annual goals (SD Exs. 20; 30 at 6-10);

- J.C.'s 2009-10 ISP, which included short-term objectives for each skill in which J.C. was working to achieve independence (SD Ex. 23 at 1-8); and

- testimonial evidence at the impartial hearing that the District's ABA classrooms recorded data throughout the day and analyzed the data on a weekly basis (Tr. 298-99, 301).

SRO Dec. at 18.  The foregoing allowed the SRO to "reasonably infer[]" that during the 2010-11

school year, "the [D]istrict would implement the 2010-11 IEP and assess benchmarks of the

[S]tudent's progress toward his annual goals in a manner similar to its assessment of the

[S]tudent's progress toward his annual goals during the 2009-10 school year."  SRO Dec. at 19.

34

The SRO also cautioned the District to conform to the IDEA requirement of including short-term objectives when formulating additional IEPs. *Id.* Upon review of the evidence, the Court finds that the administrative record supports the SRO's conclusion.

Second, Plaintiffs assert that the annual goals in the 2010-11 IEP did not include a description of how the goals would be measured. Pls.' Mem. L. 7. The SRO held that the goals, as written, "clearly define the criteria for mastery, and describe how the [S]tudent's progress will be measured consistent with the regulations." SRO Dec. at 18. The Court's review of the final IEP supports the SRO's conclusion as each of the fifty-seven annual goals contains evaluation criteria, indicating the percentage of accuracy necessary to attain mastery of a goal; the procedure by which the goal will be reviewed; a schedule for when such evaluations must take place; and who has primary responsibility for measuring each goal. SD Ex. 13 at 7-16. *See generally M.M. ex rel. A.M. v. N.Y.C. Dep't of Educ. Region 9 (Dist. 2)*, 583 F. Supp. 2d 498, 508-09 (S.D.N.Y. 2008) (upholding an SRO's conclusion that an IEP contained measurable goals). The SRO's conclusion is supported by the record. Accordingly, Plaintiffs have failed to establish a procedural violation, let alone one which deprived J.C. of a FAPE. *Tarlowe v. N.Y.C. Bd. of Educ.*, 07 Civ. 7936 (GEL), 2008 WL 2736027, at *9 (S.D.N.Y. July 3, 2008).

### D. Substantive Adequacy

An IEP is substantively adequate if it "provides personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *D.D-S. v. Southold Union Free Sch. Dist.*, 09 Civ. 5026 (JS) (WDW), 2011 WL 3919040, at *11 (E.D.N.Y. Sept. 2, 2011), *aff'd sub nom. D. D-S. v. Southold Union Free Sch. Dist.*, 11-4697, 2012 WL 6684585 (2d Cir. Dec. 26, 2012) (quoting *Rowley,* 458 U.S. at 203) (internal quotation marks omitted). As stated above, the IEP must "be reasonably calculated to enable the child to

receive educational benefits," *Gagliardo*, 489 F.3d at 107 (citation and internal quotation marks omitted), "likely to produce progress, not regression,'" and afford the student with an opportunity greater than mere "trivial advancement." *Cerra*, 427 F.3d at 195 (quoting *Walczak*, 142 F.3d at 130) (internal quotation marks omitted).  However, a school district is not required to provide "every special service necessary to maximize each handicapped child's potential," *Cerra*, 427 F.3d at 195 (citation and internal quotation marks omitted), or "everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (citation and internal quotation marks omitted).  Moreover, there is "a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." *Walczak*, 142 F.3d at 122 (citation and internal quotation marks omitted).

"Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Cerra*, 427 F.3d at 195.  "Deference is likewise appropriate where, as here, the district court's review is limited to the administrative record on which the SRO based his decision." *P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist.*, 569 F. Supp. 2d 371, 384 (S.D.N.Y. 2008).  Further, a court cannot choose between the competing views of experts on matters of educational policy or substitute its own judgment for that of the hearing officers which it reviews.  *Id.* (citing *Briggs v. Bd. of Educ. of Conn.,* 882 F.2d 688, 693 (2d Cir. 1989); *A.E. v. Westport Bd. of Educ.,* 463 F. Supp. 2d 208, 220 (D.Conn. 2006)).  When deciding whether a school district has met its obligations under the IDEA, a court "must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan." *Cerra,* 427 F.3d at 195 (citation and internal quotation marks omitted).

36

Plaintiffs assert that J.C. was substantively denied a FAPE.  In support of their assertion, Plaintiffs argue that:  (1) the goals reflected in the IEP were inappropriate for J.C.'s needs; and (2) the proposed 6:1+2 special class setting, along with the 1:1 aide, was not suited to his needs because (a) the class did not provide a full-time ABA program, (b) J.C. could not benefit from being in a class with typically developing students, and (c) J.C. required 1:1 instruction from a trained teacher, and the District's provision of a 1:1 aide was an inadequate substitute.

a.  Adequacy of Goals

An IEP is substantively invalid if it fails to include appropriate goals.  34 C.F.R. § 300.347(a)(2); 8 N.Y. Comp. R. & Regs. § 200.4(d)(2)(iii).  However, as indicated above, "whether a procedural or a substantive issue-the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim,* 346 F.3d at 382.  Plaintiffs rely heavily on Lyons' testimony before the IHO (1) that J.C.'s goals were too advanced for J.C. and (2) that Dr. Silvestri's June 2010 progress summary misrepresented the Student's abilities.  *See* Pls.' Mem. L. 7; Pls.' Opp. Mem. L. 10-11.

In rejecting the IHO's reliance on Lyons' testimony that J.C.'s goals were not appropriate, the SRO noted that Lyons merely testified that in her opinion, six of the fifty-seven goals were a "couple of steps ahead" of J.C.'s then-current level of functioning.  SRO Dec. at 18. The SRO further held that the IHO "afforded an undue weight and inappropriately relied solely on [Lyons'] testimony" to support finding the goals inappropriate; however, the SRO stated that even if he accepted Lyons' testimony, "such harm—within the context of a total of 57 annual goals in this case—would constitute no more than a de minim[i]s harm." *Id.*  The Plaintiffs here do not even attempt to put forth an argument against the SRO's reading of the impartial hearing

transcript; they merely point to the IHO's finding and ask the Court to accept it. Pls.' Mem. L. 7. However, the SRO explained that he based his conclusion on a reading of the entire record, including the testimony of the numerous teachers and other professionals that testified, and which the IHO did not explicitly address.

In his independent and thorough review, the SRO found that the hearing record and verbal and written reports as a whole revealed that J.C. "had demonstrated slow but steady progress" throughout the 2009-10 school year. SRO Dec. at 23. Specifically, the SRO concluded that the evidence showed that J.C. had made progress in his ability to attend to instruction, identify his own name, make requests, wait, follow one-step directions, follow and generalize classroom routines, request preferred items/activities, match pictures, imitate vocal and gross motor models, play with toys, and interact socially. *Id.* The SRO also found that J.C. had demonstrated some success in his toilet training program and generally decreased biting incidents. The evidence cited by the SRO in support of his conclusion included Dr. Silvestri's June 2010 progress summary, SD Ex. 20; the November 2009 BIP, SD. Ex. 37; the June 2010 ISP, SD Ex. 23; the June 2010 After-School Home Program Annual Progress Note, SD Ex. 22; Ferber-Lerner's speech-language summary at the June 2010 CSE meeting, SD. Ex. 18; Dr. Salsberg's June 2010 updated psychological progress report, SD Ex. 21; Dr. Silvestri's summer 2010 progress report, SD Ex. 16; a PROMPT speech therapy report, SD Ex. 27; and OT updates, SD Ex. 24. SRO Dec. at 23-24. Furthermore, the SRO acknowledged that "[a]lthough the providers' reports reflected some inconsistencies in the [S]tudent's abilities in some areas, each of the teachers and clinicians who worked with the [S]tudent reported that he had made progress toward his 2009-10 IEP goals." *Id.* at 24.

The SRO next addressed Lyons' testimony that she did not believe that J.C. had ever exhibited the level of skills reported by the District.  The SRO explained that the hearing record "repeatedly reflects" that J.C. exhibits regression following school breaks or illnesses.  *Id.*  For example, Whitman testified that after a school break, J.C.'s skills would need to be retaught.  Tr. 186-88.  Additionally, Lyons and Lackey, instructors at MCC, testified that as soon as J.C. learned a new skill, he lost something previously mastered.  IHO Dec. at 8-9; Tr. 599. Accordingly, the SRO concluded that the evidence did not support the Plaintiffs' contention that the 2010-11 IEP was improperly designed, or that the goals were deficient, because J.C. had failed to achieve a particular rate of progress during the year.  SRO Dec. at 24.

In spite of the various evidentiary sources relied upon by the SRO, the Plaintiffs argue that the SRO's conclusion was mistaken because J.C.'s 2009-10 progress reports indicate that his progress was "negligible" and he even regressed in some areas.  Pls.' Mem. L. 7-8.  In particular, Plaintiffs claim that the SRO ignored a progress report of November 2009, Ex. 30, prepared by Dr. Silvestri, which they claim showed that J.C. made "de minimis" progress in the District's 2009-10 program, and that the SRO unreasonably relied solely on Dr. Silvestri's June 2010 report, SD Ex. 20.  Pls.' Mem. L. 9-10; Pls.' Opp. Mem. L. 10.  Plaintiffs also assert that the SRO ignored evidence that J.C.'s biting increased throughout the year, showing peaks in April, May, and July 2010, Pls.' Opp. Mem. L. 10, and that he made "little, if any, progress in most areas" from November 2009, when Whitman prepared a report on the Student, SD Ex. 31, to June 2010, when she issued her After-School Home Program Annual Progress Note, SD Ex. 22. Pls.' Opp. Mem. L. 10-11.  However, Plaintiffs' evidence does not refute the conclusions of the SRO.  As noted above, the SRO acknowledged that there were some inconsistencies regarding reports of J.C.'s progress, but on the whole, the evidence supports the finding that he made slow

but steady progress towards his IEP goals.  Accordingly, the Court finds that J.C.'s annual goals in his 2010-11 IEP were not inconsistent with his identified needs and defers to the well-reasoned analysis of the SRO on this question of sufficiency of goals.  *See M.M. ex rel. A.M.*, 583 F. Supp. 2d at 508-09 (upholding an SRO determination and rejecting plaintiffs' contention that an IEP inaccurately reflected a student's then-present levels of performance and that the District failed to develop appropriate goals because the student lacked the prerequisite skills to attain most of the proposed goals).

b.  Provision of ABA Instruction

As a second substantive challenge, the Court reads Plaintiffs' papers as alleging that the District failed to provide the Student with a full-time ABA program.[12]  Plaintiffs cite to the IHO's conclusion that Goorevitch's testimony that J.C. would receive a full-day ABA program was contradicted by McDermott's testimony that DTT would be provided in her class during the school day for one to two hours at most.  Pls.' Opp. Mem. L. 12.  However, in reversing the IHO's opinion, the SRO found that the proposed 6:1+2 class applied ABA principles to teaching throughout the school day.  Further, the SRO found that the IHO had misconstrued the District's testimony and concluded that ABA teaching was synonymous with 1:1 DTT instruction, when in fact the evidence revealed that DTT is just one ABA tactic, but not ABA itself.  SRO Dec. at 23.  While the Plaintiffs acknowledge the difference between ABA and DTT, and recognize that an ABA classroom does not mean 1:1 DTT instruction all day, they assert that the proposed placement did not provide all-day ABA instruction.  *See* Pls.' Resp. 56.1 ¶ 94.

---

[12] In their papers, Plaintiffs cite to testimony which they claim contradicts the District's argument that J.C. would have received a full day ABA program.  Pls.' Opp. Mem. L. 12.  Plaintiffs do not actually make any legal arguments regarding this evidence; however, as both parties repeatedly discuss whether or not the Student would have received all day ABA instruction, the Court will address this matter.

Upon the Court's review, the record supports the finding that J.C.'s proposed 6:1+2 class was an ABA classroom which used a variety of evidence-based teaching tactics throughout the school day, including DTT.  SD Exs. 20 at 1-2; 22 at 1-2; Tr. 69-71, 275-76, 304.  Specifically, McDermott explained that her classroom would utilize DTT instruction as part of an overall ABA approach, and additional evidence revealed that J.C. would have received ABA instruction in his after-school program, in the form 1:1 DTT instruction.  Tr. 213, 298-99, 303-06, 324, 331. Accordingly, the District's program provides the ABA instruction which the Parents claim is lacking.

   c.   Exposure to Typically Developing Peers & Abilities of Students in 6:1+2 Class

As a third substantive challenge, the Court construes Plaintiffs' papers as contesting the SRO's conclusion that J.C. could receive educational benefit from exposure to typically developing peers.  Pls.' Reply Mem. L. 4.[13]  At the impartial hearing, Dr. Salsberg testified that when he wrote in his February 2009 psychological evaluation of J.C. that "[p]lacement should also include other children who [were] active and c[ould] model and promote good social behavior," he meant that J.C. should not be placed with typically developing peers, but rather with autistic children in a special education class.  The SRO found that Dr. Salsberg's conclusion regarding J.C.'s inability to benefit from exposure to typically developing peers was not supported by the "weight of the evidence" and furthermore, the SRO found Dr. Salsberg's testimony on this issue to be "equivocal."  SRO Dec. at 24.

---

[13] Plaintiffs refer to Dr. Salsberg's testimony that J.C. would not benefit from exposure to typically developing peers.  Pls.' Reply Mem. L. 4.  Once again, Plaintiffs do not actually make any legal arguments regarding this evidence; however, as both parties repeatedly discuss whether or not the Student could benefit from exposure to typically developing peers, the Court will address this issue.

In addressing this issue in their briefs, the parties devote a lot of space debating whether or not the District's program meets the legal standard for the least restrictive environment as required under the IDEA.  *See* Pls.' Opp. Mem. L. 8; Def.'s Mem. L. 14, 26; Def.'s Reply Mem. L. 5-6; Def.'s Opp. Mem. L. 4.  However, as admitted by Plaintiffs, they are not challenging whether the District's placement was offered in the least restrictive environment.  Pls.' Opp. Mem. L. 13.  Rather, they are simply arguing that the proposed class was not calculated to provide J.C. with educational benefit as required under the law since J.C. could not receive benefits from exposure to typically developing peers.

In addressing this argument, the SRO noted that the CSE rejected the idea of strictly 1:1 instruction precisely because they believed J.C. required continued exposure to peers to develop joint attention and play skills, the ability to follow routines in a group, and leisure skills.  SRO Dec. at 21.  Upon the Court's review, the evidence supports the SRO's finding.  For example, as the District points out, Whitman, who coordinated J.C.'s home program and observed him in school and at home, testified that J.C. would benefit from exposure to typically developing peers.  Similarly, McDermott, the Student's proposed teacher in the 6:1+2 class, testified that her students have similar educational and behavior needs to J.C., and that they have benefitted from exposure to typically developing peers.  Tr. 309-12; Def.'s Reply Mem. L. 5-6.  Also, Goorevitch testified that J.C.'s proposed class would "provide[] him with opportunities for engagement with his peers . . . [s]o he has opportunities within that setting for co-curricular and incidental opportunities to be with typically developing, same aged peers."  Tr. 71-72.  Finally, the text of Dr. Salsberg's February 2009 report clearly states that placement should include interactive children who can model and promote good social behavior.  As against this evidence, the SRO's determination that Dr. Salsberg's testimony was unpersuasive will not be disturbed.

42

In the alternative, Plaintiffs argue that J.C. would not have been grouped with a suitable peer group in his 6:1+2 class.  Pls.' Opp. Mem. L. 13.  Plaintiffs argue that two of the children in the proposed class could work independently, which they state J.C. cannot do.  They also claim that several other students have significant behavioral issues which require significant attention from the staff and that these students do not have their own 1:1 aides, making it the responsibility of the classroom staff to manage these behaviors.  As a result, Plaintiffs claim that "[t]he range of academic functioning . . . make[s] clear that J.C. would not be appropriately grouped with the students in the classroom for academic purposes."  *Id.* at 14.

As discussed by the Second Circuit in *Walczak,* New York's regulations require that each child's IEP must identify a specific class placement, and noted:

> Children may be grouped together in a special education class if they have "the same disabilities" or if they have "differing disabilities [but] ... similar individual needs for the purpose of being provided a special education program."  8 N.Y.C.R.R. § 200.1(jj); *see also* 8 N.Y.C.R.R. § 200.6(g)(3).  Thus, the students in a class must have sufficiently similar academic levels and learning characteristics that each child will have the opportunity to achieve his or her annual goals.  *See* 8 N.Y.C.R.R. § 200.6(a)(3)(i).  A CSE must also strive to "assure that the social interaction within the group is beneficial to each student, contributes to each student's social growth and maturity, and does not consistently interfere with the instruction being provided."  8 N.Y.C.R.R. § 200.6(a)(3)(ii).  Nevertheless, the regulation cautions that the "social needs of a student shall not be the sole determinant" of his or her class placement.  *See id.*

*E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 424 (S.D.N.Y. 2010), *aff'd*, 487 F. App'x 619 (2d Cir. 2012) (quoting *Walczak,* 142 F.3d at 123) (alteration in original). Here, the SRO stated that the classroom profile for the 6:1+2 class for 2010-11 included students between five and eight years of age, who had similar profiles to J.C.  SRO Dec. at 26 n.26. Specifically, all of the students had cognitive levels below the 1% level and "[J.C.'s] abilities are commensurate with the abilities of the other students in the proposed class, with some students

functioning slightly above, and others slightly below, the [S]tudent's functional levels." *Id.*

McDermott also testified that the students in her class presented classifications of multiple

disabilities, autism, mental retardation and emotional disturbance and that like J.C., six of the

children received related services of speech therapy, physical therapy, OT and PROMPT

therapy.  SD Ex. 55 at 1-3; Tr. 278-91.  As discussed in *E.S.*, the Court "is not being asked

whether this was the best possible group of children with whom [J.C.] could have been placed . .

. In this case, the similarities in academic and cognitive needs amongst the group make it an

appropriate placement." *E.S. ex rel. B.S.*, 742 F. Supp. 2d at 436.  The "relevant inquiry is not

whether the Placement Classroom provided all possible support to ensure that the Student did not

lose focus, but rather whether objective evidence indicated that []he was likely to progress, not

regress, under the proposed plan." *E.A.M. ex rel. E.M.*, 2012 WL 4571794, at *11 (quoting *S.F.*,

2011 WL 5419847, at *17-18) (internal quotation marks omitted).  Nothing in the record

suggests that J.C. would regress if grouped with the students in the proposed 6:1+2 class, and the

SRO found that the placement classroom could have provided an appropriate grouping for J.C.

His decision on this point was reasoned and supported by the evidence, and is accordingly

entitled to deference.

     d.  Lack of Solely 1:1 Instruction

     Plaintiffs' final argument, and the crux of their case, is that J.C. required 1:1 instruction

by a trained educator and that the provision of a 1:1 teacher's aide is not an appropriate

substitute.  Pls.' Mem. L. 1, 7; Pls.' Reply Mem. 6; Pls.' Opp. Mem. L. 7.  The Plaintiffs argue,

as found by the IHO, that it was "impossible" to know whether J.C.'s 1:1 aide would provide

instruction or simply help to "physically restrain the child during the course of the school day."

Pls.'s Mem. L. 7 (citing IHO Dec. at 13).

However, the SRO did not find that J.C. actually required full-time 1:1 instruction by a special education teacher, as opposed to 1:1 support by a dedicated aide, to make educational progress. *R.E.*, 694 F.3d at 192. The main evidence suggesting that J.C. required teacher-led 1:1 instruction is the testimony of Dr. Salsberg. The Court is not at liberty to favor Dr. Salsberg's opinion, that of a privately hired expert, over the deference that should appropriately be accorded to the District in matters of educational policy. *E.S. ex rel. B.S.*, 742 F. Supp. 2d at 436 ("The mere fact that a separately hired expert has recommended different programming does nothing to change [the] ... deference to the district and its trained educators" (quoting *Watson v. Kingston City Sch. Dist.*, 325 F. Supp. 2d 141, 145 (N.D.N.Y. 2004), *aff'd*, 142 F. App'x 9, 10 (2d Cir. 2005)) (internal quotation marks omitted).

Moreover, the District explained how the Student's needs would have been addressed through implementation of the IEP, including the supervision of the 1:1 aide by the special education teacher. As recently recognized by the Second Circuit, "[t]he adequacy of 1:1 paraprofessional support as opposed to 1:1 teacher support is precisely the kind of educational policy judgment to which we owe the state deference if it is supported by sufficient evidence," which is the case here. *R.E.*, 694 F.3d at 192. Here, the evidence in the record supports the SRO's well-reasoned conclusion that the services of a 1:1 teacher's aide with extensive experience in ABA instruction, and who has already worked with J.C., would allow him to make educational progress. Finally, the Parents do not have a right under the IDEA to compel the District to provide a specific program or use a specific methodology when educating their child. *L.K. v. Dep't of Educ. of the City of New York*, 09 Civ. 2266 (RMM) (LB), 2011 WL 127063, at *11 (E.D.N.Y. Jan. 13, 2011) ("The IDEA does not permit [parents] to challenge an IEP on the grounds that it is not the best or most desirable program for their child" (quoting *M.M. v. Sch.*

45

*Bd. of Miami–Dade Cnty.,* 437 F.3d 1085, 1103 (11th Cir. 2006) (alteration in original)); *see also J.F. v. N.Y.C. Dep't of Educ.*, 12 Civ. 2184 (KBF), 2012 WL 5984915, at *8 (S.D.N.Y. Nov. 27, 2012) (recognizing that the appropriate student to teacher ratio for a child "is partly a matter of educational policy" in which a well reasoned SRO conclusion deserves deference). "That the size of the integrated classes in which [J.C.] was offered a placement was larger than his parents desired does not mean that the placement was not reasonably calculated to provide educational benefits." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 869 F. Supp. 2d 320, 335 (E.D.N.Y. 2012).

The Parents also assert that J.C. would have been receiving instruction from the 1:1 aide, as opposed to instruction from the special education teacher, in contravention of New York State regulations. Pls.' Opp. Mem. L. 11-12. Under New York regulations, "[o]ne-to-one aides may not be used as a substitute for certified, qualified teachers for an individual student [and a] teacher['s] aide may assist in the implementation of a behavioral intervention plan, but may not provide instructional services to a student." Guidelines For Determining A Student With  A Disability's Need For A One-to-One Aide, New York State Education Department (January 2012), http://www.p12.nysed.gov/specialed/publications/1-1aide-jan2012.pdf. A 1:1 aide may, among other things, maintain files and prepare statistical reports; manage records, materials and equipment; and supervise students under the supervision of the special education teacher. In addition, an aide may be responsible for assisting in physical care tasks and health-related activities as appropriate and assisting students with behavioral and management needs. Teaching Assistants Pursuing Certification, New York State Education Department, http://www.highered.nysed.gov/tcert/career/tavsta.html (last visited March 14, 2013).

The District argues that J.C.'s aide would have been responsible for maintaining his program book, taking data during DTT practice, maintaining that data, preparing statistical reports, and assisting with behavioral and management needs; all under the supervision of J.C.'s special education teacher.  *See* Def.'s Reply Mem. L. 2-3.  In response, Plaintiffs argue that Goorevitch characterized the aide as an *instructional aide*, and thus the IHO found that the District had failed to address the issue of why the aide would be presenting instruction when there was no evidence that she had a college degree or certification credentials.  Pls.' Opp. Mem. L. 12.  The evidence in the record does not indicate that the aide would have exercised any responsibilities outside of those which she was allowed to perform.  The Court finds the District's fleeting characterization of the aide as an instructional aide to be of no legal significance.

## IV. CONCLUSION

The Court finds that the preponderance of the evidence supports the SRO's well-reasoned conclusion that the IEP was reasonably calculated to enable J.C. to receive educational benefits as required by the IDEA and would allow J.C. to make educational progress, and not regress. Having concluded that the District offered J.C. a FAPE for the 2010-11 school year, the Court need not reach Plaintiffs' claims regarding their unilateral placement of J.C. at MCC.  *See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009) (upon a finding that an IEP is procedurally and substantively adequate, the court need not evaluate the services provided by the parents); *Gavrity v. New Lebanon Cent. Sch. Dist.*, 05 Civ. 1024 (NAM) (DRH), 2009 WL 3164435, at *33 (N.D.N.Y. Sept. 29, 2009) (same).

Accordingly, Plaintiffs' Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED.  The Clerk of the Court is respectfully directed to terminate the motions (Docs. 10, 15) and to close this case.

SO ORDERED.

Dated: March 15, 2013
   White Plains, New York

                Edgardo Ramos, U.S.D.J.